**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AMY WILCOX,

Plaintiff,

Case No:
Hon.

v.

HAZEL PARK SCHOOL DISTRICT, and
HAZEL PARK BOARD OF EDUCATION,

Defendants.
______________________________________________/

THE SHARP FIRM, PLLC
Attorneys for Plaintiff
Heidi T. Sharp (P69641)
43260 Garfield Road, Suite 280
Clinton Township, MI 48038
(586) 226-2627
heidi@sharpfirmlaw.com
______________________________________________/

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

NOW COMES PLAINTIFF, Amy Wilcox, through her attorneys, and for her Complaint against the above-named Defendants hereby states as follows:

**Jurisdictional Allegations**

1. This is a civil lawsuit alleging damages from unlawful employment actions in violation of The Whistleblower Protection Act, the Fourteenth Amendment to the United States Constitution, and the Michigan Open Meetings Act.

2. This Court has original federal question jurisdiction over Plaintiff's claims arising under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343.

3. This Court has pendent jurisdiction over Plaintiff's state law claims arising under the Michigan Whistleblowers' Protection Act and the Michigan Open Meetings Act pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal constitutional claim that they form part of the same case or controversy.

4. Defendant Hazel Park School District ("District") is a School District located in Oakland County, Michigan.

5. Defendant Hazel Park Board of Education ("Board") acts as the governing body for the school district of Hazel Park located in Oakland County, Michigan.

6. The acts and transgressions complained of in this Complaint occurred in Oakland County, Michigan.

7. Jurisdiction is otherwise proper in this court.

8. Venue is otherwise proper in this court.

**Background**

9. Plaintiff has devoted her professional career to public education.

10. Plaintiff is a highly experienced educator and school administrator with more than twenty years of experience in educational leadership, curriculum development, special education, strategic planning, business operations, and school district administration.

11. Plaintiff earned a Bachelor of Arts in Special Education from Elmhurst College, a Master of Arts in Educational Leadership from National Louis University, and a Doctor of Education in Educational Leadership from Lewis University. Plaintiff also earned a Certificate of Advanced Studies.

12. Before joining the Hazel Park School District, Plaintiff held progressively responsible administrative positions in public education. From approximately 1997 through 2002, Plaintiff served as Assistant Superintendent of Special Education for Naperville Community School District 203, where she oversaw administrators providing services to more than 2,000 students with disabilities across twenty-one schools. From approximately 2002 through 2007, Plaintiff served as Superintendent of the Niles Township District for Special Education, where she directed services for approximately 1,000 special education students and served as the State Approved Director for ten school districts. From approximately 2007 through June 2015, Plaintiff served as Superintendent of Niles Elementary School District 71.

13. Plaintiff's extensive experience in special education, educational administration, and District leadership ultimately led to her selection as Superintendent of Defendant Hazel Park School District in or around July 2015.

14. In July 2015, Plaintiff became Superintendent of the Hazel Park School District, where she has served for more than eleven years. As Superintendent, Plaintiff oversees the District's functions and operations and has been responsible for leading and supporting the District's educational, financial, personnel, and operational objectives.

15. Plaintiff's position requires her to work closely with the Board, District administrators, employees, families, and members of the Hazel Park community.

16. Plaintiff initially entered into a three-year Superintendent Contract with the District in May 2015, covering the period of July 1, 2015 through June 30, 2018, at an annual salary of $140,000.

17. On or about July 7, 2016, the Board approved an addendum extending Plaintiff's contract for a five-year term through June 30, 2021.

18. The July 2016 addendum increased Plaintiff's annual salary to approximately $142,100.

19. On or about June 12, 2017, the Board approved a second addendum to Plaintiff's contract, increasing her annual salary to approximately $143,876.

20. On or about February 11, 2019, the Board again extended Plaintiff's employment as Superintendent through June 2022.

21. On or about April 20, 2020, the Board approved another extension of Plaintiff's employment through June 30, 2023. At said time, Plaintiff's annual salary was approximately $149,674. On or about December 14, 2020, the Board approved another salary adjustment, increasing Plaintiff's annual salary to approximately $154,164. On or about July 1, 2021, the Board again adjusted Plaintiff's compensation, including salary and merit compensation.

22. On or about January 24, 2022, the Board approved another extension of Plaintiff's employment through June 30, 2026.

23. On or about October 19, 2022, Plaintiff and the District entered into another Superintendent Contract covering the period through June 2026, with an annual salary of approximately $165,141.

24. On or about May 23, 2023, the Board again approved a five-year Superintendent Contract with Plaintiff, extending her employment through June 30, 2028. Under the May 2023 contract, Plaintiff's annual salary was approximately $171,746, in addition to available merit compensation.

25. Less than one year later, on or about February 24, 2024, the Board again approved a five-year Superintendent Contract with Plaintiff. The February 2024 contract extended Plaintiff's employment through June 2029 and provided an annual

salary of approximately $180,330, in addition to applicable compensation and benefits. For the 2025-2026 school year, Plaintiff received a salary increase, bringing her annual salary to $185,744.

26. Accordingly, over the course of Plaintiff's tenure as Superintendent, the Board repeatedly renewed and extended Plaintiff's employment and increased her compensation. By February 2024, the Board had committed to Plaintiff's continued employment as Superintendent through June 2029.

27. Throughout her tenure as Superintendent, Plaintiff regularly received favorable performance evaluations from the Board.

28. Throughout her tenure as Superintendent, Plaintiff consistently received "Highly Effective" performance evaluations from the Board.

29. In connection with each evaluation, Plaintiff routinely asked the Board whether there were any concerns with her performance or any areas in which the Board believed she needed to make adjustments or improvements. Plaintiff was never advised that changes to her performance were necessary.

30. Plaintiff's leadership also produced significant results for the District. During her tenure, Plaintiff reduced the District's financial deficit from approximately negative $8 million to a positive $1.6 million through the effective use of grants and staffing resources and refinanced two bonds, saving the District more than $7 million. Plaintiff also increased Advanced Placement course offerings

from three to eleven, secured substantial grant funding for District students and programs, and implemented numerous educational programs and initiatives designed to improve student achievement and opportunities.

31. Plaintiff's consistently "Highly Effective" evaluations and the District's repeated decisions to renew and extend her Superintendent Contract reflected the Board's longstanding approval of her performance and leadership of the District.

32. Prior to the disciplinary action arising from the 2025 investigation described below, Plaintiff had no prior disciplinary history.

33. Notwithstanding Plaintiff's history of favorable evaluations and repeated contract renewals, beginning in January 2025, Board members Beverly Hinton, Deborah Laframboise, Heidi Fortress, and Darrin Fox were consistently opposed to Plaintiff and her continued service as Superintendent. Statements were made by members of the Board that Plaintiff did not "fit in" and did not "belong" in the District.

34. On or about January 13, 2025, the Board voted to retain the Thrun Law Firm, P.C. despite having long time counsel for the Board.

35. On January 27, 2025, the Board voted 7-0 to place Plaintiff on non-disciplinary paid administrative leave while the investigation was conducted.

36. At no point while Plaintiff was on leave was she given charges or documentation regarding the scope of the investigation or reason for the leave.

37. On or about March 20, 2025, the Allen Law Group was retained to investigate Plaintiff. Plaintiff was not given notice of the scope of the investigation. She was interviewed personally in April 2025.

38. The investigation was broad in scope and examined, among other things, the District's finances, Hazel Park Junior Vikings finances, administrative hiring practices, administrative compensation, Plaintiff's contracts and extensions, allegations concerning the work environment, and the District's Wellness Committee. The investigation also examined concerns regarding the District's financial condition and audit.

39. During the relevant period, Jason Zirnis served as the District's Director of Business and Operations. Zirnis was responsible for significant aspects of the District's financial operations and was involved in matters concerning the District's annual audit.

40. In or around June 2024, Plante Moran, which had performed auditing services for the District for approximately nine years, withdrew from its engagement with the District. Thereafter, UHY was retained to complete the District's audit.

41. In September 2024, Zirnis announced that he would be leaving his position with the District.

42. Following Zirnis's departure, completion of the District's audit was delayed, resulting in the District missing a deadline associated with receipt of state aid.

43. During this same period, the Board itself was aware of and participated in decisions concerning the District's financial condition, fund balance, borrowing, and audit.

44. Nevertheless, the District's finances became one of the matters examined during the investigation of Plaintiff.

45. Plaintiff remained on non-disciplinary paid administrative leave for more than 100 days.

46. Allen Law Group ultimately concluded that there was insufficient evidence to substantiate the majority of the allegations investigated. The investigation identified three areas in which sufficient evidence was found: issues concerning the commingling of Hazel Park Junior Vikings funds, the length of a Superintendent Contract extension previously approved by the Board, and the District's failure to maintain a Wellness Committee.

47. On May 15, 2025, following completion of the investigation, the Board voted unanimously to reinstate Plaintiff as Superintendent.

48. On or about August 5, 2025, Plaintiff received a written reprimand relating to the Junior Vikings funds and the Wellness Committee. While imposing

the discipline, the District expressly acknowledged that Plaintiff had no prior discipline and had previously been rated "Highly Effective".

49. Plaintiff continued serving as Superintendent following her reinstatement and the issuance of the Plan of Assistance.

50. By March 2026, however, certain members of the Board were again seeking to end Plaintiff's employment with the District before the expiration of her contract in June 2029.

51. On March 16, 2026, the Board held a public meeting at which Plaintiff's continued employment became the subject of Board action. During the meeting, a motion was made for the Board to enter closed session concerning an item identified as Item 8H.

52. The stated basis for the proposed closed session was attorney-client privilege and the consideration of material purportedly exempt from disclosure under state or federal law.

53. Several Board members questioned the basis for the proposed closed session, including whether there was pending litigation or another proper basis for discussing the matter outside of an open meeting. The motion to enter closed session failed because it did not receive the number of votes required to convene a closed session.

54. Immediately thereafter, a motion was made to authorize the Board's law firm to prepare and negotiate an agreement to buyout Plaintiff's renewed employment contract with her and her counsel. The motion passed by a vote of four to three.

55. During the discussion that followed, serious questions arose concerning communications among Board members before the March 16, 2026 meeting and whether the outcome of the vote had been determined in advance.

56. Board member Darrin Fox stated during the public meeting that he had previously been offered an opportunity to meet with other Board members, Laframboise and Hinton, concerning Plaintiff prior to the meeting. Darrin Fox further stated that he had been informed before the March 16 meeting that there were already four votes supporting the proposed action concerning Plaintiff.

57. In response to those comments, Plaintiff publicly stated at the meeting to the entire Board that the disclosed communications demonstrated that Board members had discussed or deliberated regarding Plaintiff outside of the properly noticed public meeting. Plaintiff specifically stated aloud to the Board that the prior deliberations and its conduct were a violation of the Open Meetings Act.

58. Plaintiff made her report concerning the suspected violation directly in connection with the public meeting of the Board. Therefore, Plaintiff's report was made openly and directly to the Board concerning suspected discussions and

deliberations among Board members outside of a properly noticed public meeting regarding Plaintiff's employment, including communications concerning whether sufficient votes had already been secured to take action against Plaintiff. Plaintiff identified the Board's violation of law directly to the appropriate public body.

59. Following the March 16, 2026 meeting, the District, through its attorneys, presented Plaintiff with a proposal to end her employment before expiration of her Superintendent Contract. The proposal sought to buy out the approximately three years remaining on Plaintiff's contract. The proposed buyout was valued at approximately $996,000 and included amounts attributable to salary, benefits and other compensation Plaintiff otherwise would have received under her contract.

60. Plaintiff did not accept the proposed buyout and did not voluntarily resign from her position as Superintendent. Plaintiff therefore remained employed by the District pursuant to her existing Superintendent Contract.

61. The effort to remove Plaintiff generated substantial concern among District employees and members of the Hazel Park community, including litigation which was filed alleging violations of the Open Meeting Act. That litigation is still pending in the Oakland County Circuit Court.

62. Approximately four months after Plaintiff reported the suspected Open Meetings Act violation and declined the proposed buyout, the Board again took action to remove Plaintiff from the active performance of her Superintendent duties.

63. In May and July 2026, a member of the Board, Laframboise, submitted complaints to the Michigan Department of Education ("MDE") concerning matters involving the District's special education services.

64. Said Board member obtained information concerning District operations from a District employee and used that information to formulate or support complaints submitted to MDE.

65. The complaints concerned, among other things, special education services and the use of a substitute teacher without the required credential or permit for the entire period in which the substitute worked.

66. The existence of the MDE complaints was subsequently used as a stated basis for taking employment action against Plaintiff. However, MDE did not identify Plaintiff as the subject of its investigation. Rather, MDE publicly clarified that it was reviewing complaints concerning the District and that Plaintiff herself was not under investigation. Of the complaints submitted to MDE, two were determined to be insufficient to warrant investigation.

67. Nevertheless, on July 22, 2026, the Board convened a special meeting concerning the MDE complaints. The purpose of the meeting had been intended to

discuss the complaints with the Board's counsel to educate it on the outcome of the MDE investigation. This did not occur.

68. Rather, during the meeting, a surprise motion was made by Board President Hinton to place Plaintiff on non-disciplinary paid administrative leave pending an investigation into possible policy and legal violations. This motion was clearly a surprise to at least two board members, while the four who had originally voted to place her on leave in the prior year were not surprised despite no notice being given and it not appearing on the agenda.

69. During the meeting, Hinton was asked how she could bring items forward which had not been included on the agenda, and she announced that the Board's counsel told her in advance that she could do so, demonstrating she planned to make a surprise motion without including it on the District's agenda for the meeting.

70. Plaintiff objected to the proposed action and disputed that the MDE complaints provided cause to place her on suspension.

71. Without giving Plaintiff notice or an opportunity to be heard on the matter, gathering no information and before the MDE could issue its response to the complaints, the motion was set for a vote before discussion was even concluded by other Board members.

72. The Board voted to place Plaintiff on administrative leave for the second time in approximately eighteen months.

73. The July 2026 administrative leave removed Plaintiff from the active performance of the Superintendent position notwithstanding the fact that MDE had expressly stated that Plaintiff herself was not under investigation.

74. Board member Darrin Fox who voted in favor of placing Plaintiff on leave publicly stated during the meeting, "we're just ready to move in a different direction".

75. Immediately after voting to place Plaintiff on leave, the Board moved to appoint an interim superintendent.

76. Additionally, Board President Hinton identified Griff Mills as the proposed interim superintendent.

77. At least one Board member stated during the public meeting that she did not know who Mills was. When questioned concerning Mills's qualifications and who had recommended him, President Hinton provided limited information and declined to identify the individual who had recommended him.

78. Multiple board members said during the meeting that they had to Google the name "Griff Mills" because they had never heard it before.

79. The Board nevertheless voted to proceed with Mills as interim superintendent.

80. The Board placed Plaintiff on administrative leave in July 2026 in retaliation for her March 2026 report concerning Board members' discussions and deliberations regarding her employment outside of a public meeting, which Plaintiff reported as a violation of the Michigan Open Meetings Act.

81. Plaintiff had not resigned, had not accepted the District's proposed buyout, and remained contractually employed as Superintendent through June 2029.

82. Nevertheless, following the July 22, 2026 vote, Plaintiff was prevented from performing the duties of the position for which the District had repeatedly renewed her employment.

83. Importantly, less than one month before placing Plaintiff on administrative leave for a second time, on June 23, 2026, Plaintiff provided a Mid-Year Presentation to the Board regarding her performance and the District's operations. At the conclusion of the presentation, Plaintiff expressly asked the Board for feedback regarding her performance, including whether the Board had any questions, concerns, or areas in which it believed she needed to improve. The Board raised no questions or concerns regarding Plaintiff's performance, identified no areas requiring improvement, and established no additional goals or corrective measures for Plaintiff to address.

84. Defendants' repeated efforts to remove Plaintiff from the Superintendent position caused Plaintiff significant emotional and physical distress.

85. Plaintiff had devoted more than a decade to serving as Superintendent of the Hazel Park School District and had repeatedly been entrusted by the Board with continued leadership of the District through successive contract renewals and extensions.

86. Despite such history, Plaintiff was twice removed from the active performance of her position, without notice or an opportunity to be heard, subjected to repeated investigations, and faced continuing efforts to end her employment before the expiration of her contract.

87. These events have been public, followed by the paper and members of the community throughout the happenings. Plaintiff's reputation and standing in the community have been effected.

88. The events beginning with the March 2026 effort to buy out Plaintiff's contract and culminating in her second administrative leave in July 2026 caused a significant deterioration in Plaintiff's emotional and physical well-being.

89. Following the July 2026 administrative leave, Plaintiff experienced severe anxiety associated with her employment and the circumstances surrounding her removal from the Superintendent position.

90. Plaintiff has suffered emotional distress, mental anguish, physical manifestations of emotional distress, loss of professional standing and reputation, and other damages as a result of Defendants' conduct.

91. As of September 18, 2026, Plaintiff remains on leave and allegedly "under investigation" despite no investigation taking place and the District receiving a response from the MDE as early as August 21, 2026. She has not been interviewed and upon information and belief the District has not hired any firm or given any direction to investigate her.

**COUNT I- 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS**

92. Plaintiff re-alleges and reaffirms all previous paragraphs as though contained fully herein.

93. Plaintiff was employed by Defendant Hazel Park School District as its Superintendent.

94. The terms and conditions of Plaintiff's employment are governed by her Superintendent Contract with Defendants.

95. Plaintiff's Superintendent Contract provided for a definite term of employment extending through June 30, 2029.

96. Plaintiff's Superintendent Contract reasonably instilled a legitimate expectation of continued employment through the term of her contract, subject to the terms and conditions contained therein.

97. Plaintiff therefore possessed a protected property interest in her employment as Superintendent.

98. Plaintiff was entitled to due process before Defendants deprived her of her protected property interest.

99. Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions she was facing.

100. Plaintiff had a significant interest in avoiding negative and permanent designations on her employment record, the tarnishing of her professional record as a public-school administrator, and the loss of the position she had held for more than a decade.

101. Plaintiff was entitled to fundamentally fair procedures to determine whether she engaged in disciplinable and/or terminable misconduct.

102. In July 2026, Defendants relied upon complaints submitted to the Michigan Department of Education as a purported basis to take action against Plaintiff.

103. The Michigan Department of Education expressly stated that Plaintiff herself was not under investigation.

104. Nevertheless, on July 22, 2026, Defendants placed Plaintiff on administrative leave pending an investigation into alleged policy and legal violations.

105. Plaintiff was not presented with specific notice of the charges or potential grounds for discipline being considered against her.

106. Plaintiff was not presented with an adequate explanation of the evidence and witnesses pertaining to the potential discipline.

107. Plaintiff was not afforded a meaningful opportunity to present her response to the charges to the decision maker before Defendants removed her from the active performance of her position.

108. Plaintiff was not afforded a meaningful hearing to challenge the grounds upon which Defendants removed her from the active Superintendent position.

109. Instead, Defendants removed Plaintiff from the active performance of the Superintendent position and immediately proceeded to install another individual to perform the duties and responsibilities of that position.

110. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law".

111. Plaintiff has a protected property interest in her employment, which Defendants cannot deprive her of absent due process of law.

112. Defendants deprived Plaintiff of the active exercise of her Superintendent position without affording her basic due process rights.

113. Plaintiff's property interest was invaded by Defendants in an arbitrary and irrational manner.

114. Defendant Hazel Park School District agreed to, approved, and ratified the unconstitutional conduct through the official actions and votes of its Board of Education.

115. It would have been plainly obvious to a reasonable public official that depriving Plaintiff of her protected property interest without notice and a meaningful opportunity to respond would deprive or lead to the deprivation of Plaintiff's constitutional rights.

116. There exists no rational relationship between Plaintiff's actual conduct and Defendants' decision to remove Plaintiff from the active performance of her Superintendent position.

117. In depriving Plaintiff of her constitutionally protected property interest in her employment, Defendants violated Plaintiff's right to procedural due process under the Fourteenth Amendment to the United States Constitution.

118. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including but not limited to damage to her professional and personal standing, emotional distress, mental anguish, physical manifestations of emotional distress, and other economic and non-economic damages.

WHEREFORE, Plaintiff prays for a judgment that is fair, just, and in accordance with the facts produced in Court considering all potential compensatory damages including attorney fees, costs and interest.

## COUNT II - VIOLATION OF THE MICHIGAN WHISTLEBLOWERS' PROTECTION ACT

119. Plaintiff re-alleges and reaffirms all previous paragraphs as though contained fully herein.

120. At all material times, Plaintiff was an employee and Defendant Hazel Park School District is her employer, covered by and within the meaning of the Whistleblowers' Protection Act, MCL 15.361 et seq., MSA 17.428(1).

121. At all relevant times, Defendants Hazel Park School District and the Board of Education constitute a "public body" within the meaning of MCL 15.361(d).

122. On or about March 16, 2026, Plaintiff reported conduct that she believed constituted a violation or suspected violation of the Michigan Open Meetings Act, MCL 15.261, et seq.

123. Specifically, during the March 16, 2026 Board meeting, information was disclosed concerning communications between Board members regarding Plaintiff and the number of votes available to take action against her before the matter was publicly deliberated and voted upon.

124. Plaintiff reported directly to the Board during the public meeting that the disclosed conduct violated or was suspected of violating the Michigan Open Meetings Act.

125. Plaintiff made her report to the Hazel Park Board of Education, a public body under the WPA.

126. Plaintiff's report of an actual or suspected violation of Michigan law constituted protected activity under MCL 15.362.

127. Defendants were aware of Plaintiff's protected activity because Plaintiff raised the suspected Open Meetings Act violation directly in connection with the public Board meeting and the Board's consideration of action concerning her employment.

128. Thereafter, Defendants increased its efforts to end Plaintiff's employment as Superintendent before the expiration of her contract.

129. Plaintiff thereafter continued serving as Superintendent and remained employed under a contract extending through June 2029.

130. Approximately four months after Plaintiff reported the suspected Open Meetings Act violation, Defendants again removed Plaintiff from the active performance of her Superintendent duties based upon a complaint filed by a Board member to the Michigan Department of Education.

131. On July 22, 2026, Defendants placed Plaintiff on non-disciplinary paid administrative leave purportedly pending investigation into possible policy and legal violations arising from complaints submitted to the Michigan Department of Education.

132. However, the Michigan Department of Education expressly stated that Plaintiff herself was not under investigation.

133. Defendants' stated reliance upon the MDE complaints was pretextual and was used as a means to remove Plaintiff from the Superintendent position after she declined the proposed buyout and reported the suspected Open Meetings Act violation.

134. Plaintiff's protected activity was a motivating factor in Defendants' decision to again remove Plaintiff from the active performance of her Superintendent duties.

135. Defendants took retaliatory action against Plaintiff and violated the Whistleblowers' Protection Act, MCL 15.362, when they placed Plaintiff on administrative leave, materially altering the terms, conditions, and privileges of Plaintiff's employment because she engaged in protected activity.

136. Defendants' actions were intentional.

137. As a direct and proximate result of Defendants' unlawful actions against Plaintiff, Plaintiff has suffered and continues to suffer injuries and damages,

including, but not limited to, loss of earnings, loss of career opportunities, mental and emotional distress, loss of reputation and esteem in the community, and loss of the ordinary pleasures of everyday life.

WHEREFORE, Plaintiff prays for a judgment that is fair, just, and in accordance with the facts produced in Court considering all potential compensatory damages including attorney fees, costs and interest.

**COUNT III- VIOLATION OF THE MICHIGAN OPEN MEETINGS ACT**

138. Plaintiff re-alleges and reaffirms all previous paragraphs as though contained fully herein.

139. Defendant Hazel Park Board of Education is a public body subject to the Michigan Open Meetings Act ("OMA"), MCL 15.261 et seq.

140. Pursuant to MCL 15.263, all decisions of a public body must be made at a meeting open to the public, and all deliberations of a public body constituting a quorum of its members must take place at a meeting open to the public unless otherwise permitted by the OMA.

141. On July 22, 2026, Defendant Board convened a special meeting concerning complaints submitted to the Michigan Department of Education.

142. The intended purpose of the meeting was to discuss the MDE complaints with the Board's counsel and to educate the Board concerning the status and outcome of the MDE investigation.

143. Instead, during the meeting, Board President Beverly Hinton made a surprise motion to place Plaintiff on non-disciplinary paid administrative leave pending an investigation into possible policy and legal violations.

144. The proposed action against Plaintiff had not been identified on the agenda for the July 22, 2026 special meeting.

145. The motion was a surprise to at least two members of the Board. In contrast, the four Board members who had previously voted to place Plaintiff on leave were aware that the motion would be made.

146. During the public meeting, Hinton was questioned concerning her ability to bring forward an item that had not appeared on the agenda.

147. Hinton stated that she had consulted with the Board's counsel before the meeting and had been advised that she could bring the matter forward.

148. Hinton's consultation concerning the presentation of the motion before the July 22 meeting, together with the prior knowledge of four members of the Board that the motion would be made, demonstrates that the proposed action against Plaintiff had been discussed and deliberated outside of the public meeting before it was presented for public consideration.

149. The Board thereafter voted to place Plaintiff on administrative leave, removing Plaintiff from the active performance of her Superintendent duties.

150. Immediately after voting to place Plaintiff on leave, the Board moved to appoint an interim superintendent and Hinton identified Griff Mills as the proposed interim superintendent.

151. Multiple Board members stated during the meeting that they did not know Mills and had to search for information concerning him during the meeting because they had not previously been informed that he was being considered for the position.

152. Nevertheless, Hinton was prepared to identify Mills and proceed with his appointment immediately following the vote to place Plaintiff on administrative leave.

153. Hinton shutdown discussion on both matters and called for a vote on both motions before discussions had concluded.

154. The circumstances surrounding the July 22, 2026 meeting demonstrate that members of the Board discussed and deliberated concerning Plaintiff's removal and replacement outside of the public meeting before those matters were presented to the full Board and the public.

155. Defendant Board's deliberations concerning Plaintiff's removal from the active performance of her position and the appointment of her replacement outside of an open meeting violated the Michigan Open Meetings Act, MCL 15.263.

156. Defendant Board's conduct deprived Plaintiff and the public of the open deliberative process required by the Michigan Open Meetings Act.

157. As a direct result of Defendant Board's violation of the Michigan Open Meetings Act, Plaintiff is entitled to all relief available under the Act.

WHEREFORE, Plaintiff prays for a judgment that is fair, just, and in accordance with the facts produced in Court considering all potential compensatory damages including attorney fees, costs and interest.

Dated: September 21, 2026

Respectfully Submitted,

/s/ *Heidi T. Sharp*
By: Heidi T. Sharp (P69641)
Attorney for Plaintiff
43260 Garfield, Suite 280
Clinton Township, MI 48038
(586) 226-2627
heidi@sharpfirmlaw.com

**DEMAND FOR JURY TRIAL**

Plaintiff, through her attorneys, THE SHARP FIRM, PLLC, makes a demand for a trial by jury in the above-entitled matter.

Dated: September 21, 2026

Respectfully Submitted,

/s/ *Heidi T. Sharp*
By: Heidi T. Sharp (P69641)
Attorney for Plaintiff
43260 Garfield, Suite 280
Clinton Township, MI 48038
(586) 226-2627
heidi@sharpfirmlaw.com